16

ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.

D-13 STEVEN ADAMCZYK, D.O.

Defendant.
_____________________________/

Case No: 17-cr-20465

Hon. Denise Page Hood

VIO: 18 U.S.C. § 1349

**SUPERSEDING INFORMATION**

THE UNITED STATES OF AMERICA CHARGES:

FILED USDC - DT
2018 JUL 20 AM10:37

**General Allegations**

At all times relevant to this Superseding Information:

**The Medicare Program**

1. The Medicare program was a federal health care program providing benefits to persons who were 65 years of age or older, or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3. Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

4. Specifically, Part A of the Medicare program covered inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation.

5. Part B of the Medicare program covered the cost of physicians' services, medical equipment and supplies, and diagnostic laboratory services. Specifically, Part B covered medically necessary physician office services, outpatient physical therapy services, nerve conduction testing, ultrasounds, and nerve block injections, including facet joint injections. Part B also covered services that were provided in connection with a laboratory testing facility, including urine drug testing.

6. National Government Services ("NGS") administered the Medicare Part A program for claims arising in the State of Michigan. Wisconsin Physicians Service ("WPS") administered the Medicare Part B program for claims arising in the State of Michigan. CGS Administrators LLC ("CGS") administered the Medicare Part B program for claims arising in the State of Ohio. CMS contracted with NGS to receive, adjudicate, process, and pay Part A claims. CMS contracted with WPS and CGS to receive, adjudicate, process, and pay certain Part B claims, including medical services related to physician office services, outpatient physical therapy services, and nerve block injections, including facet joint injections, as well as

services that were provided in connection with a laboratory testing facility, including urine drug testing.

7. TrustSolutions LLC was the Program Safeguard Contractor for Medicare Part A and Part B in the State of Michigan until April 24, 2012, when it was replaced by Cahaba Safeguard Administrators LLC as the Zone Program Integrity Contractor ("ZPIC"). Cahaba was replaced by AdvancedMed in May 2015.

8. The Program Safeguard Contractor or ZPIC is a contractor that investigates fraud, waste, and abuse. As part of an investigation, the Program Safeguard Contractor or ZPIC may conduct a clinical review of medical records to ensure that payment is made only for services that meet all Medicare coverage and medical necessity requirements.

9. Payments under the Medicare program were often made directly to a provider of the goods or services, rather than to a Medicare beneficiary. This payment occurred when the provider submitted the claim to Medicare for payment, either directly or through a billing company.

10. Upon certification, the medical provider, whether a clinic, physician, or other health care provider that provided services to Medicare beneficiaries, was able to apply for a Medicare Provider Identification Number ("PIN") for billing purposes. In its enrollment application, a provider was required to disclose to Medicare any

person or company who held an ownership interest of 5% or more or who had managing control of the provider. A health care provider who was assigned a Medicare PIN and provided services to beneficiaries was able to submit claims for reimbursement to the Medicare contractor/carrier that included the PIN assigned to that medical provider.

11. A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who had ordered the services. When an individual medical provider was associated with a clinic and medically necessary services were provided at that clinic's location, Medicare Part B required that the individual provider numbers associated with the clinic be placed on the claim submitted to the Medicare contractor.

12. By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided

with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

13. Health care providers could only submit claims to Medicare for reasonable and medically necessary services that they rendered. Medicare would not pay claims procured through kickbacks and bribes.

14. Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through WPS and other contractors, to review the appropriateness of Medicare payments made to the health care provider.

15. Under Medicare Part B, physician office visit services, outpatient physical therapy services, nerve conduction, and nerve block injections, including facet joint injections, were required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury. Individuals providing these services were required to have the appropriate training, qualifications, and licenses to provide such services. Providers were required to: (1) document the medical

necessity of these services; (2) document the date the service was performed; (3) identify the provider who performed the service; and (4) identify the clinic, physician office, or group practice where the provider provided the service. Providers conveyed this information to Medicare by submitting claims using billing codes and modifiers. To be reimbursed from Medicare for physician office visit services, outpatient physical therapy services, nerve conduction, and nerve block injections, including facet joint injections, the services had to be reasonable, medically necessary, documented, and actually provided as represented to Medicare. Providers were required to maintain patient records to verify that the services were provided as represented on the claim form to Medicare. When an individual medical provider was associated with a clinic, Medicare Part B required that the individual provider number associated with the clinic be placed on the claim submitted to the Medicare contractor.

16. Under Medicare Part B, for a laboratory to properly bill and be paid by Medicare for laboratory testing, including urine drug testing, the patient must, among other things, qualify for the testing, including urine drug testing, under Medicare's established rules and regulations. The testing also must be rendered according to Medicare's rules and regulations, and certain documents must be completed before a claim is submitted for reimbursement to Medicare.

17. For a laboratory to properly bill and be paid by Medicare for urine drug testing, the urine drug testing must be both reasonable and medically necessary. Urine screenings can be "qualitative" and used to determine the presence or absence of substances, or the screenings can be "quantitative" and used to provide a numerical concentration of a substance. Medicare limits the allowed purposes of quantitative screenings. One such accepted purpose would be if a patient tested negative for a prescribed medication during a qualitative screening, but the patient insisted s/he was taking the medication. A laboratory may then perform a quantitative screening to evaluate or confirm the findings of the qualitative testing. The same is true if a patient tested positive for a non-prescribed medication/drug during qualitative testing which s/he insisted had not been used. However, regular, routine, or recreational drug screenings, however, are not reasonable or medically necessary. Further, the patient's medical record must include documentation that fully supports the reasonableness of and medical necessity for the urine drug testing.

18. Under Medicare Part A and Part B, home health care services were required to be reasonable and medically necessary to the treatment of the patient's illness or injury. Reimbursement for home health care services required that a physician certified the need for services and established a Plan of Care. Home health care services that were not certified by a physician or were not provided as represented were not reasonable and necessary. Medicare Part B covered the costs

of physicians' services, including physician home visits, physician certification and recertification of home health care services, and physician supervision of home health care services. Generally, Medicare Part B covered these costs only if, among other requirements, they were medically necessary, ordered by a physician, and not induced by the payment of remuneration.

19. Medicare coverage for home health care services required that the following qualifying conditions, among others, be met: (a) the Medicare beneficiary is confined to the home; (b) the beneficiary needs skilled nursing services, physical therapy, or occupational therapy; (c) the beneficiary is under the care of a qualified physician who established a written Plan of Care for the beneficiary, signed by the physician and by a Registered Nurse ("RN"), or by a qualified physical therapist if only therapy services are required from the home health agency; (d) skilled nursing services or physical therapy services are provided by, or under the supervision of, a licensed RN or physical therapist in accordance with the Plan of Care; and (e) the services provided are medically necessary.

20. To receive reimbursement for a covered service from Medicare, a provider must submit a claim, either electronically or using a form (*e.g.*, a CMS-1500 form or UB-92), containing the required information appropriately identifying the provider, patient, and services rendered, among other things.

**The Tri-County Network Physician Businesses**

21. Tri-County Physician Group, P.C. ("Tri-County Physicians") was a Michigan corporation doing business at 3800 Woodward Ave., Ste. 1100, Detroit, Michigan, 3011 West Grand Blvd., Ste. 305 & 307, Detroit, Michigan, and 24001 Orchard Lake Rd., Ste. 140A, Farmington, Michigan. Tri-County Physicians was enrolled as a participating provider with Medicare and submitted claims to Medicare.

22. Tri-State Physician Group, P.C. ("Tri-State Physicians") was a Michigan corporation doing business at 3011 West Grand Blvd., Ste. 306, Detroit, Michigan, 24001 Orchard Lake Rd., Ste. 140A, Farmington, Michigan, and 2100 W. Alexis Rd., Ste. B3, Toledo, Ohio. Tri-State Physicians was enrolled as a participating provider with Medicare and submitted claims to Medicare.

**The Tri-County Network Laboratories**

23. National Laboratories, Inc. ("National Laboratories") was a Michigan corporation doing business at 3011 West Grand Blvd., Ste. 310, Detroit, Michigan and 2100 West Alexis Rd., Ste. B-1, Toledo, Ohio. National Laboratories was enrolled as a participating provider with Medicare and submitted claims to Medicare.

24. Nat Lab, Inc. ("Nat Lab") was a Michigan corporation doing business at 3011 West Grand Blvd., Ste. 309, Detroit, Michigan and 2100 West Alexis Rd., Ste. B-2, Toledo, Ohio. Nat Lab was enrolled as a participating provider with Medicare and submitted claims to Medicare.

**Defendant and Other Individuals**

25. Defendant **STEVEN ADAMCZYK**, a resident of Oakland County, was a physician licensed in the State of Michigan who was enrolled as a participating provider with Medicare for Tri-County Physicians and Tri-State Physicians.

26. Mashiyat Rashid, a resident of Oakland County, controlled, owned, or operated Tri-County Physicians, Tri-State Physicians, National Laboratories, Nat Lab, and other medical providers, collectively referred to as the Tri-County Network.

**COUNT 1**
**(18 U.S.C. § 1349—Conspiracy to Commit Health Care Fraud)**
**D-13 STEVEN ADAMCZYK**

27. Paragraphs 1 through 26 of the General Allegations section of this Superseding Information are re-alleged and incorporated by reference as though fully set forth herein.

28. From in or around 2015, and continuing through in or around July 2017, in Wayne County, the Eastern District of Michigan, and elsewhere, **STEVEN ADAMCZYK** did willfully and knowingly, combine, conspire, confederate, and agree with Mashiyat Rashid, each other, and others known and unknown, to commit certain offenses against the United States, namely: to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is,

Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

**Purpose of the Conspiracy**

29. It was a purpose of the conspiracy for **STEVEN ADAMCZYK**, along with Mashiyat Rashid and other co-conspirators, to unlawfully enrich themselves by, among other things: (a) submitting or causing the submission of false and fraudulent claims to Medicare for claims based on kickbacks and bribes; (b) submitting or causing the submission of false and fraudulent claims to Medicare for services that were (i) medically unnecessary; (ii) not eligible for Medicare reimbursement; and/or (iii) not provided as represented; (c) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of the proceeds from the fraud; and (d) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

**Manner and Means**

The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

30. **STEVEN ADAMCZYK** falsely certified to Medicare that he would

comply with all Medicare rules and regulations, and federal laws, including that he would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare and that he would refrain from violating the federal Anti-Kickback statute.

31. **STEVEN ADAMCZYK** and others would require vulnerable Medicare beneficiaries, including those addicted to opioids, to submit to expensive injections before prescribing opioids and other controlled substances, even though the injections were medically unnecessary, sometimes painful, not eligible for Medicare reimbursement, and/or not provided as represented.

32. **STEVEN ADAMCZYK** and others (a) referred or caused the referral of Medicare beneficiaries for home health and other services to providers specified by Mashiyat Rashid and/or (b) arranged for, ordered, or caused the arranging for or ordering of urine drug testing, ultrasounds, MRI's, and other testing by providers specified by Mashiyat Rashid, which were procured by the payment of kickbacks and bribes, medically unnecessary, not eligible for Medicare reimbursement, and/or not provided as represented.

33. **STEVEN ADAMCZYK** and others falsified, fabricated, altered, and caused the falsification, fabrication, and alteration of medical records, including patient files, home health certifications, treatment plans, diagnostic testing orders, and other records, including provider questionnaires and other responses to

Medicare reviews of claims for services and testing, all to support claims for office visits, injections, home health services, urine drug testing, diagnostic testing, ultrasounds, MRI's, and other services that were obtained through illegal kickbacks and bribes, medically unnecessary, not eligible for Medicare reimbursement, and/or not provided as represented.

34. **STEVEN ADAMCZYK** submitted and caused the submission of false and fraudulent claims to Medicare in an amount of approximately $3,453,678.53 for services and testing that were obtained through illegal kickbacks and bribes, medically unnecessary, not eligible for Medicare reimbursement, and/or not provided as represented.

**FORFEITURE ALLEGATIONS**
**(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461; 18 U.S.C. §§982(a)(1) and (7) – Criminal Forfeiture)**

35. The allegations contained in Count 1 of this Superseding Information are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture against defendant **STEVEN ADAMCZYK** pursuant to Title 18, United States Code, Sections 981 and 982, and Title 28, United States Code, Section 2461.

36. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), together with Title 28, United States Code, Section 2461, upon being convicted of the crime charged in Count 1 of this Superseding Information, the convicted defendant shall

forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense.

37. Pursuant to Title 18, United States Code, Section 982(a)(7), upon being convicted of the crime charged in Count 1 of this Superseding Information, the convicted defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

38. Money Judgment: Property subject to forfeiture includes, but is not limited to a forfeiture money judgment equal to at least $468,472.22 in United States currency, in the aggregate, or such amount as is proved in this matter, representing the total amount of proceeds and/or gross proceeds obtained as a result of defendant's violation as alleged in Count 1 of this Superseding Information.

39. Substitute Assets: If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b) and/or Title 28, United States Code, Section 2461, to seek to forfeit any other property of **STEVEN ADAMCZYK** up to the value of such property.

MATTHEW SCHNEIDER
UNITED STATES ATTORNEY

WAYNE F. PRATT
Chief, Health Care Fraud Unit
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226
(313) 226-9583
wayne.pratt@usdoj.gov

MALISA DUBAL
Assistant Chief
Criminal Division, Fraud Section
211 W. Fort St., Suite 2001
Detroit, MI 48226
(202) 660-2001
malisa.dubal@usdoj.gov

JACOB FOSTER
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Eighth Floor
Washington, D.C. 20005
(202) 305-3520
jacob.foster@usdoj.gov

Dated: July 20, 2018

ORIGINAL

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | **Case Number**<br>17-cr-20465 |
|---|---|---|

**NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.**

| **Companion Case Information** | **Companion Case Number:** |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | **Judge Assigned:** |
| ☐ Yes ☒ No | **AUSA's Initials:** JNF |

**Case Title:** USA v. Steven Adamczyk

**County where offense occurred :** Wayne County

FILED USDC - DT
2018 JUL 20 AM 10:37

**Check One:** ☒ **Felony** ☐ **Misdemeanor** ☐ **Petty**

____Indictment/____Information --- **no** prior complaint.
____Indictment/____Information --- based upon prior complaint [**Case number:** ]
____Indictment/ ✓ Information --- based upon **LCrR 57.10 (d)** ***[Complete Superseding section below]***.

## Superseding Case Information

**Superseding to Case No:** 17-cr-20465 **Judge:** Hon. Denise Page Hood

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☒ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| Steven Adamczyk | 18 U.S.C. § 1349 | |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

July 20, 2018
Date

Jacob Foster,Trial Attorney
211 West Fort Street, Detroit, MI 48226
Phone:(202) 615 - 6521
Fax: (313) 226 - 0816
E-Mail address: Jacob.Foster@usdoj.gov
Attorney Bar #: CA 250785

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.